Good morning, your honors. Todd Burns on behalf of Mr. Sivilla. In considering the appropriate remedy for the destruction of evidence in this case, I think it's important to keep in mind the entire range of the government's conduct. Months before the Jeep Cherokee involved in this case was destroyed, the defense had made three requests that it be preserved. The government had made three promises that it would take all necessary steps to preserve it. The district court had entered two orders that the Cherokee be preserved and the contractors or agencies having custody of it be advised of that order. Nevertheless, the government destroyed the Jeep Cherokee. And when it was called on that shortly before trial, it gave a misleading answer as to the circumstances surrounding the destruction. Then at trial, it exploited its exclusive access to the evidence at every stage of trial, in opening, in trial testimony, in closing, in rebuttal closing. And when defense counsel tried to sort of call the government on what it had done by presenting testimony from the defense investigator, the government's sole rebuttal witness was its case agent, who once again presented misleading testimony to the jury regarding the facts surrounding the destruction. Now, all of this, you raise all this because the judge didn't give an adverse jury instruction. Or dismiss the case. Or dismiss the case for bad faith. Yes. So the judge found that there was no bad faith here. There was carelessness and negligence, but no bad faith. That's correct. And I think that that was error. You know, when I look over the cases yesterday, one thing that struck me is when you consider the full range of conduct here, the only case from this Court that comes close is the Cooper case, in which there was destruction of some lab equipment. The defense expert and the defense requested that it be preserved. The government destroyed it. The defense never had a chance to look at it, and this Court dismissed. And I think if you look at the test for dismissal, based on Youngblood and some related cases like Valenzuela-Bernal, you know, the first question for bad faith is, did the government have reason to believe that this evidence could be useful to the defense? Here the government clearly had reason to believe that. It had been repeatedly requested to preserve it. It had promised to preserve it. It had been ordered to preserve it. Well, this was all about looking at the engine, having an opportunity to inspect the engine where they removed the, what was it, the car? The manifold. Manifold. That's it. In order to retrieve the packages that they could see. That's correct. Is that right? Yes. And the government made that a cornerstone of its case, that this was a very complex compartment, that it was dangerous to disassemble, that it took a professional mechanic to do it. So what do you think, what was the defense theory about that? I mean, what were you going to, if you had been able to inspect the vehicle, what was it that you, what is it that you think you could have done that you weren't able to do because you didn't have the ability to inspect the actual vehicle? What would have been done, and what was indicated by defense counsel to the court, is that a defense expert with respect to mechanics would have looked at the compartment, would have assessed the compartment, would have assessed how long the drugs might have been there without saying, you know, melting or burning, and also how difficult it would be to access the drugs, how difficult it would be to build the compartment. I thought you called an expert. He didn't. I called an expert with respect to drug trafficking, a former Mexican prosecutor, with respect to the fact that, you know, drug trafficking organizations do use what they call blind mules, people that are smuggling and don't know they're smuggling. But with respect to a mechanic expert, this is not some far-fetched idea. I spent 13 years, federal defenders of San Diego. One of the investigators has a background in mechanics, and he is frequently called to testify with respect to compartments in these cases. How long would it take to build it? How quickly could someone get it out? How likely is it that the person driving the car would not know that that compartment was there? I can think of, you know, about a handful of cases in which I have called that person to testify as to exactly that sort of thing. Okay. Suppose we don't agree with your argument that there was bad faith. You had another request that ---- Yes. The other request was for an instruction to the jury that, look, the government was told to preserve this, and they destroyed it, from which the defense counsel could then argue, you know, the inference that, well, they destroyed it because it wasn't useful to them, or, you know, you should take this into account in considering whether or not there's reasonable doubt. And the district court said it would not give that instruction because it found that there was no bad faith. And as I set out in my papers, I think that that's directly contrary to this court's en banc opinion in Loud Hawk, as followed by Flyer and recently in an unpublished opinion in Zuniga, which says, Loud Hawk says, look, and that's a sixth judge. It's called a Judge Kennedy concurrence. But it's a sixth judge opinion saying, look, this is sort of a sliding scale. If you have a lot of government bad faith, maybe you don't need any prejudice. And if you have a lot of prejudice, you may not need any bad faith. And here there was, you know, an adequate basis from which to conclude that there was some government wrongdoing, there was something bad on the government side of the scale, and there was some prejudice. So if you look at the balancing test in Loud Hawk, I think, you know, a jury instruction was certainly required. Also, you know, another argument that I made in there is it's really, as long as there's some foundation in the evidence from which the jury could draw an adverse inference, it's really for the jury to decide what it makes of this whole series of events. Didn't you bring out during the cross-examination that there was an order and it wasn't complied with? Yes, defense counsel did that. And then what the government did in response is it put on its case agent and he got up there and he told the same story that had been told to the district court, which is this sort of idea that, well, the written order was filed on the 21st and the case agent was out of town and he didn't get it until the 25th, and meanwhile on the 22nd the car was forfeited. And so it went to scrap. But that's misleading because there were promises and orders long before the written order, number one. Number two is the paperwork submitted by the defense investigators shows, which is at 86 in the excerpt of record, the car wasn't transferred from DHS, from the federal government's custody, until November 23rd. And the defense investigators' declaration to the district court said the same thing. So you've got two months while they still got it under custody. They could stop it from being destroyed if they followed the district court order. And they've been told, contact all agencies, contact all contractors. This is not an excuse for their behavior. But it seemed to hoodwink the district court, and it probably hoodwinked the jury, too. But it's not forthcoming. It's not honest. Did the government argue harmless error here? I don't think they did, no. As a matter of fact, and I think I pointed out in my papers that they didn't, and so that that's waived. Okay. I will reserve the rest of my time if there are no other questions. What role did that cabinet, the manifold play in the prosecution's case? It was central. I mean, in their opening they said, look, this was hard to access. It would have taken a lot of time. We had to bring in a mechanic. There was a fire when we tried to access it. You know, they then brought out testimony. It's 11 pages of testimony from the primary witness, you know, supporting all that. And their closing, they came back to it as well. Along with the value of the drugs, that's the only thing that they relied on to show knowledge. Look, this was a complex compartment. It would have been really hard for anyone to get it out. This guy must have known it was in there. They said, after going through all this litany of things about the compartment, they said, does that make any sense? Do you have a reasonable doubt based on that? No, of course not. I mean, that was the cornerstone of their case. It's hard to see how they could have exploited their exclusive access to this evidence any more than they did. Thank you. Thank you. May it please the Court, Joseph Smith, Assistant U.S. Attorney. Why can't the government get things right? Your Honor, the government didn't always get things right. However, in this case, the government did take reasonable steps. You really think that's true? Are you telling me the truth? I'm telling you the truth, Your Honor. Yes, I am. How long did it take? The government got the notice to preserve the vehicle, right? That's correct. And they didn't follow that order. Well, the government attempted to follow the order given the understanding of both myself as a prosecutor and the case agent at the time as how the fines, penalties, and forfeitures section handled forfeitures. That was a mistaken belief. However, when the order was received on the 21st, it was conveyed to the case agent. Well, that's part of your job to know how it works, isn't it? That's correct, Your Honor. But when there's a misunderstanding or that's not the analysis that this Court takes, whether or not I was or the case agent was misinformed about the procedures, the issue is bad faith. And given all the facts in the case and given all the information the district court had, the district court determined there was an issue of negligence. It was not an issue of bad faith. So what are you hiding behind now? The government is hiding behind anything. Your Honor, is there? What is it? Your Honor, the government is not hiding behind. The government is relying upon the existing case law, which requires. . . Following Loudhock. Well, Your Honor, there's the case after Loudhock. It was a concurring opinion. The government's position. . . No, wait a minute. Concurred in by a majority of the unmarried court. That's the law of the circuit. And the government did address it. Do you understand that? Loudhock is the law of the circuit. Yes, Your Honor. And why didn't you follow it? Well, in the briefs the government does address the issue. . . No, but why isn't it the law of this case then? The government's follow-on position was that given. . . What? Given Loudhock, the government does address Loudhock and does address the Loudhock standard. All right, but then it wasn't applied. The Loudhock standard was the law of the case but was not applied. Do you agree to that? The Loudhock standard, the government's position is that given the Loudhock standard and if the court applies the Loudhock standard, the government still prevails. And the government did address that in its brief and I can address it right now. I'm prepared to do so. But the district court didn't apply the Loudhock standard. That's correct. Although the district court. . . The district court said there's no bad faith. They said you don't get an adverse jury instruction and dismissal is off the table. Yes, Your Honor. And actually the court actually didn't ever say you don't get an adverse jury instruction because. . . adverse inference jury instruction because that was never before the court. Sure it was. In the in limiting motion, he asked for an adverse inference instruction. Your Honor, what he asked for was an instruction which had three components to it. First, that the court ordered the vehicle preserved. Second, the government failed to comply with the order. And third, that the defense was unable to inspect the vehicle. And the district judge said there's no bad faith here, no instruction. That's correct. And the fourth part, which is the part that on appeal the appellant says should be implied, is given the destruction of the evidence, the jury can infer that there is exculpatory value to that. That was never addressed at the district court. In fact, it was given multiple. . . That's essentially what he was asking for, though, correct? The government. . . My position is no, that wasn't what he was asking for because he was actually specifically asked. His first initial motion was. . . Well, the problem is the district judge, as Judge Noonan just said, wouldn't entertain anything because he found no bad faith. Well, the district court was never asked. . . And he was applying the wrong standard. That's right, but the district court was never asked to entertain that adverse inference jury instruction. What he was asked to do was to instruct on facts which were undisputed, that were in the record from multiple witnesses. Given that, given the fact that there was the fact the order was put into evidence, the fact that the defense investigator, Mr. Zamora, and the case he testified about the fact the vehicle was destroyed, the fact there are photographs of the destroyed vehicle in the record as well. . . Quite, quite inadequate. Your Honor? You know, you come up and argue this. . . I don't think you can get the feeling of this court. You've lost, but you want to go on. You want to give a hint. You've really lost the case. You might as well concede it. Well, the government isn't in a position to concede. The government feels that legally, as an initial issue, that they've. . . Well, do it right. . . Do it right. Do it right. Follow the orders, you know. There was another part to this. Wasn't there a hearing in front of the district judge early on when there was a request for preservation? Yes, there was. And the judge said he made an oral order. And he said to be followed up with a written order. To be followed up by. . . Let me ask you this. Why isn't it. . . Was the case agent in court that day? No, Your Honor. The case agent was not in court. Just you. So why wouldn't you get up on the. . . This is what I didn't understand. Why wouldn't you get on the phone to whoever you're working with and say the judge has orally ordered that we preserve all evidence? Your Honor, the reason why I didn't. . . Why wouldn't you do that? I don't understand. Because. . . Really, I don't. . . As is on the record, both myself and the case agent were under misimpression that the fines. . . No, but you said you were there in court and you heard the judge, correct? Yes, Your Honor. And you didn't think it was worth anything? No, Your Honor. I was of the understanding that they would inform the case agent when they were going to forfeit the vehicle. Who's they? They, the Fines, Penalties and Forfeiture section of the. . . No, no, no. I'm talking about when you were in court when the judge made an oral order. Yes, Your Honor. Did you get. . . When you left the courtroom, did you go back to your office and call? No, Your Honor, I didn't. And I was explaining the reasons why. . . The reason why I didn't was because I was of the understanding that the Fines, Penalties and Forfeiture section would contact the case agent prior to. . . Forfeiture of the vehicle. So you didn't think you had any affirmative obligation. That is, you didn't have any obligation to take an affirmative act to make sure that the evidence is preserved. I was under the understanding that an affirmative act takes necessary steps to preserve it. And I didn't feel it was a necessary step because I felt that. . . So you didn't think you needed to do anything. Why isn't that bad faith? Well, one, because, I mean, the district court, with all the information in front of it and the testimony of witnesses, determined that it was not bad faith. And I think that for sound reasons. Bad faith usually applies some sort of conscious desire to adversely affect the rights of the defendant. In this case, my understanding, which was a misunderstanding, and the case agent's misunderstanding were that the vehicle would be preserved.  Well, given my current understanding of the fact that that section within CBP does take forfeiture action without informing the case agent or the AUSA, then the steps I would have to take would be to affirmatively contact the case agent. So the judge should have said, Mr. Fines, I'm going to impose upon you, to impress upon you, the need to take some affirmative steps to preserve the evidence. Mr. So-and-so, I want you to affirmatively call, right here in the courtroom, I want you to call whoever. No, no, the court wouldn't be required to do anything. It would be upon me understanding. . . Yeah, but you apparently didn't understand his order. I didn't understand the need to communicate that to that section prior to them taking independent action that I wasn't aware they had. Well, how else would they find out? The clerk of the courts supposed to. . . No, Your Honor, they would find out when they contacted the case agent to inform them of the disposition of. . . Who is they? They being the Fines, Penalties, Forfeiture section of the Customs and Border Protection Agency. It's the agency which handles the administrative forfeitures of vehicles seized and assets seized. Was there anyone from the agency there? There was no one from the agency there at that time, no. So how would they. . . Could have had a homing pigeon, you know. I used to raise homing pigeons. Yes, Your Honor. Yeah. Well. . . And if I can just point to one thing. . . The one. . . When talking about bad faith, the appellant mentioned. . . The appellant's counsel mentioned the Cooper case. The distinguished factor of the Cooper case, which involved methamphetamine cooking vessels. Well, there were two important facts. One is the district court made a finding of bad faith. And on appeal, the government did not fight or challenge that finding of bad faith. That's vastly different from this case. The second thing is in the Cooper case, there was actually a witness who testified to the fact that. . . An expert in chemistry testified to the fact that he could not determine whether or not those vessels were used for cooking of methamphetamine or cooking of any sort of legal substance without physically looking at the vessels. And even the government's witness said that he wouldn't know the state of the vessels. In addition to that, I believe in that case there were no photographs taken. In this case, there were five photographs. I know that on. . . In his reply brief, the appellant's counsel on appeal says that they were of poor quality. Let me ask you this. As Judge Noonan pointed out, in the Loud Hawk case, the concurrence by Judge Kennedy really sets the rule. That is, you don't need bad faith. You don't need bad faith. It's a balancing test. In the Loud Hawk, given that balancing test, in this case, the government and I think the court asked about prejudice. And it's hard for the government. It's hard for the appellant's counsel to even articulate what the prejudice would be. He talks about potential fingerprinting and potentially looking in and seeing how long the drugs had been there. But the drugs and the drug patching was preserved, and they were never inspected. So the district court didn't comply with the Loud Hawk holding, correct? It was playing a bad faith test. Correct. The district court did not. Did you argue harmless error here? In our brief at, I think, footnote 6, there is a discussion of harmless error on page 37 of the brief. And it basically incorporates the information contained in the rest of the pleading to indicate that, given the evidence in the case, and I know that in, if I could just have a moment to address the appellant's concern, that we relied solely upon the vehicle itself. Actually, there was a vast amount of information before the jury, and the jury took an hour and 40 minutes to convict. And it wasn't based solely upon that. It was based, in large part, upon the fact that the appellant brought witnesses in who testified about a second vehicle that he had. And the second vehicle was parked near the border. Initially, he said it was being fixed and it wasn't working. His wife disclaimed information, much information about it. On cross-examination, she admitted, yes, they went there, they had a parking stub, and she had the keys for this vehicle. Their own expert came and testified and said, drug trafficking organizations oftentimes have a separate person load the vehicle, and then they meet and they pick that vehicle up. That was something that was consistent with the evidence. It was consistent with the government's argument. The government argued that, that there was this vehicle, there was this story and these lies under oath about the state of the vehicle, what the vehicle was doing, who knew about the vehicle and where it was parked, and for how long. What I don't understand is, I can't, it was always my understanding that if a vehicle was involved in the execution of a crime, that you wouldn't send the vehicle, and it could have some evidentiary value, but you don't send the vehicle over to the junkyard. You wait until the case is over, and then they auction the vehicle off if you win. I mean, do you know of any other instance? I'm aware of other instances where vehicles or other evidence in drugs, but you think that the drugs and the drug packing wouldn't be something that would be destroyed, and drugs and drug packing have been destroyed in the past. Well, I'm talking about the vehicle. About the vehicle itself. Vehicles, it's, there's a, the number of vehicles that are taken in, and having gone to the lots where they store these vehicles, I know that the volume of vehicles is extremely high, and it's a different agency, and that's, I can't, I cannot. So it's okay to, you arrest someone, say, at a border crossing, and the person is driving a vehicle, and there are drugs that are hidden in the vehicle, and there's this compartment, then without telling the defense lawyer or whatever, the vehicle can just then be turned over to a wrecker, be destroyed. Is that what you're telling me goes on? That's what happened in this particular case? Well, I mean, is that normal? I think at some point all vehicles, and this is obviously outside the record, but all vehicles that have a compartment in them, non-factory compartment, the policy is eventually to have those vehicles not go back into service because they can't have drug compartments in vehicles driving around, and a lot of vehicles are substantially torn up in. Yeah, you're talking about while the case is pending. That's not my understanding of, that wasn't my understanding of how it worked, but what I learned is that, at least in this one instance, for whatever reason, it was. I mean, I can't, I'm not defending my own actions in not preserving people. I'm defending my own actions in being misinformed and not consciously trying to, or acting in bad faith or consciously trying to destroy potential evidence. And if the court is inclined to find that the district court should have applied Laudoc and didn't, then the government would ask the court, they would entertain remanding the case back to the district court so the district court could make those findings, rather than on appeal with a record before it, make a determination that the district court abuses discretion or that the district court committed clear error or plain error. Let me ask you this. What would the district court do? I mean, do you think the district court would say, well, I made a mistake. I should have given an adverse jury instruction, therefore I'm going to vacate the verdict and declare a mistrial? Well, the district court would have the proper standard before it. The district court would be able to. But he can't now instruct the jury. The jury is gone. But then with that information, the court can make additional findings. It wouldn't have to be an evidentiary. And the court can make findings as to, given the evidence before it, whether or not it felt there was prejudice to the appellant in this case and whether or not using the Loudhock Bouncer test. You never know what a jury is going to do with a piece of evidence. I mean, speculate about it. But the jury would have known that this vehicle, I mean, the defendant here says he turned it over to his brother-in-law and then his brother-in-law was murdered, right? Yes, Your Honor. And he was killed. Who do you think killed him? Who do I think killed him? I believe that most likely Mr. Cedilla and his brother-in-law and others were involved in drug trafficking, and that's what happens when drug traffickers lose. Do you think he killed his brother-in-law? Is that what you're telling me? No, he was in custody. The brother-in-law was killed after Mr. Cedilla drove the drugs across, was caught, and the drugs were seized. There was evidence that this brother-in-law was a boyfriend of his sister-in-law. There was evidence that the boyfriend of his sister-in-law was a real person. There was evidence that this person was shot. The jury had that evidence before them. The defense had the ability to present additional evidence, and the only evidence we had was that before us at trial was that the sister-in-law's boyfriend was killed after these drugs were taken and lost at the border, not inconsistent with a drug organization taking retribution against one member. That's speculative to say that that proves Mr. Cedilla wasn't involved. It couldn't prove just as much as Mr. Cedilla was involved because he had a close relationship with somebody who may have been involved and may have been killed when Mr. Cedilla wasn't successful in crossing the drugs. Okay. Thank you. Thank you. I'd just like to respond to a couple things. Regarding the prejudice, I think the record speaks for itself as far as the government's exploitation of its exclusive access to the compartment, but one thing that government counsel said that I think deserves a specific response is with respect to the defense expert. The defense expert that testified talked about blind mules and said, look, this is something that happens. Drugs are hidden in cars without people knowing. Government, in its closing argument, said, that defense expert told you that this only happens when the drugs are easily accessible, and the uncontroverted testimony here is that the drugs were not easily accessible. The uncontroverted testimony. I'm sorry. The government said the uncontroverted testimony is that the drugs were not easily accessible. Well, it's uncontroverted because the defense never had access to those, so I don't think that the government correctly characterized the defense expert's testimony, number one. Number two, they then exploited their exclusive access to the compartment. Regarding remanding to the district court to let the district court decide under the correct standard if the instruction should have been given, that's sort of like arguing harmless error and allowing to argue harmless error from the district court, which I don't think the government's even preserved that argument in front of this court, number one. Number two, you know, supported by the case law that I briefed regarding if there is some evidence from which the jury can infer bad faith, wrongdoing, however you want to put it, that instruction should be given. And there's certainly some evidence here from which the jury could infer that. So the last thing that should happen is this goes back to the district court. The district court decides it shouldn't have given the instruction again, and we come back up here to figure out that issue, which is obvious. So I don't think that that's a just or sensible resolution to this. You didn't propose a specific jury instruction here. Well, no, there was not a one submitted. He did leave out the last part of the argument that, you know, of the jury instruction, that you can draw an adverse inference. But as Your Honor pointed out, he pretty much had all the building blocks here. The government was told to preserve it. They didn't preserve it. And the defense couldn't look at it. You know, from there, you don't really need the last piece. You can just argue that to the jury. It's apparent to the jury what's going on there. Could an instruction have been better crafted, you know, consistent with adverse inference instructions? Yes. The district court, however, specifically said, look, I don't want a specific instruction from you at this point. It's too early for that. We're not at jury instructions. I'm not giving an instruction because I don't find bad faith. So they never even got to really crafting a specific instruction anyway. Well, now, it's pretty clear that we're going to reverse. What do you want us to do? Well, I would like the court to order that the indictment be dismissed, of course. I guess that's the obvious answer. Otherwise, I think it's clear that an adverse inference instruction or some effective remedy should have been given, one that the government can't thwart by, you know, using misleading testimony as well, and that there would be a retrial with an appropriate remedy. I really think that an adverse inference instruction is a pretty soft remedy for what happened here. You know, probably a more appropriate remedy is the government doesn't get to use any, doesn't get to refer to the compartment, doesn't get to use any evidence with respect to the compartment. They've removed it from the defense. They've removed it from themselves. If there are no further questions, I'll submit. All right. Well, thank you very much. And this matter is submitted.
judges: Pregerson, Noonan, Paez